IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN B. EICHELMAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LANCASTER COUNTY, et al., | : | |
| Defendants. | : | NO. 06-547 |

**<u>MEMORANDUM OPINION</u>**

DAVID R. STRAWBRIDGE                                     August 21, 2007
UNITED STATES MAGISTRATE JUDGE

## I.    INTRODUCTION

Plaintiff Jonathan B. Eichelman ("Plaintiff" or "Eichelman") brought this action against, *inter alia*, Defendants Lancaster County ("the County"); Vincent Guarini, the warden of the Lancaster County Prison ("Warden Guarini"); Corrections Officer M. King ("C.O. King"); and Corrections Officer Torres ("C.O. Torres").[1]  He seeks monetary relief relating to his treatment while detained in the Lancaster County Prison ("the Prison") for a short period of time in June 2005.  The parties consented to magistrate judge jurisdiction.  (Doc. No. 25.)

Presently before the Court is the motion for summary judgment filed on behalf of the County, Warden Guarini, and Corrections Officer King (collectively "the County Defendants").  (Doc. No. 31.)  Also before the Court is the motion for summary judgment filed by C.O. Torres.  (Doc. No. 32.)

---

[1] Other defendants — various corrections officers, a doctor in the County prison medical department, and "John" or "Jane Doe" persons — have been dismissed from this suit.  (*See* Orders dated Aug. 10, 2007 (Doc. No. 66) and Aug. 15, 2007 (Doc. No. 76.)

Both motions have been fully briefed and are now ripe for resolution.  For the reasons set forth below, we will grant in part and deny in part Defendants' motions.

## II.      FACTUAL BACKGROUND[2]

Plaintiff was arrested on June 3, 2005 for a shooting incident that took place the previous day outside a Lancaster County Taco Bell restaurant in which a two-year old Hispanic boy was wounded. He protested his innocence while being taken to the police department and before the district justice. He was then transported to the Prison in the early morning hours of Saturday, June 4, 2005.  The police officer who transported him to the Prison advised a Prison intake official, C.O. Riley, that Eichelman was "the one that shot the two year old at Taco Bell."  At some point thereafter, and within earshot of inmates, C.O. Riley proceeded to inform two constables who happened to be present in the commitment area that Eichelman was charged in that particular shooting.  (Aponte Dep. [Ex. D] at 7, 23-24, 29; Laureano Dep. [Ex. Q] at 22-25; Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 5.)

Another new detainee, Jose Soto, was also brought to the Prison on June 4.  Soto had been within earshot of C.O. Riley when he commented to the constables that they were detaining the

_____

[2] The memoranda of law in support of Defendants' motions contained narrative sections describing the "factual background" of the case.  Plaintiff's responses to the two motions contain his own narrative section entitled "counter statement of facts."  Apart from a few footnotes in Plaintiff's papers highlighting contested facts, for the most part, the parties' papers do not make it readily apparent which facts (whether or not deemed "material") are disputed as to create issues for the jury to resolve.  In light of the summary judgment standard, we assume to be true, for purposes of this motion, the facts asserted by Plaintiff that have some support in the record.  We do not purport to describe contrary facts as to issues for which Plaintiff presents sufficient evidence to defeat summary judgment.  Obviously, at trial the jury will hear differing versions of events, will have an opportunity to judge the credibility of the source, and will be tasked with the responsibility of determining what probably occurred.

individual involved in the baby shooting.[3]  Eichelman observed Soto and another Hispanic inmate turn and look at him as law enforcement personnel in the commitment area appeared to talk about him and look at him.  Soto and the other inmate were then placed in the same holding cell as Eichelman, although other holding cells were available.  Eichelman felt that the two Hispanic inmates had their eyes on him after nearby officials pointed him out.  Soto then slapped or punched Eichelman in the face, to which Eichelman responded by "screaming ... for a minute or two": "I didn't do it, I didn't do it, I'm telling you, I didn't do it."   When Eichelman asked Soto why he punched him, he understood Soto to refer to the "little boy."  (Eichelman Dep. [Ex. C] at 144-45, 150; Aponte Dep. [Ex. D] at 7-8, 24-26; Riley Dep. [Ex. P] at 19-20.)

Constable Aponte witnessed the assault and advised C.O. Riley, who had been standing behind the desk, that the "Spanish guy" just "popped the shit out of that white boy."  C.O. Riley advised Constable Aponte to ignore it and not look so obvious, making reference to the surveillance cameras in the commitment area.  (Aponte Dep. [Ex. D] at 8-10; Aponte Stmt. dated Sept. 19, 2005 [Ex. MM].)

Eichelman remained in the commitment section until he could be more formally classified by appropriate personnel.  A supervisory officer, however, determined that while he was in the commitment section he should be housed in a cell by himself, "based on the inmate's charges and the event surrounding those charges." (Ennis Stmt. dated June 9, 2005 [Ex. S].) Eichelman's formal classification interview was conducted by the incoming supervisor on the next shift, Sgt. Terlikowsky.  When asked in the course of that interview whether there were potential problems with

---

[3] Soto indicated in a statement that a "sheriff" pointed out Eichelman to him and informed him that "[the] white guy over there, he abused a young child.  You should go in there and tell those guys to give him a beating."  (Soto Stmt. (unsigned) dated Sept. 29, 2005 [Ex. R].)

inmates, Eichelman responded in the affirmative, but the form completed by Sgt. Terlikowsky indicates that the identity of those persons was "unknown." (Terlikowsky Dep. [Ex. J] at 22-27; Lanc. Cty. Prison Med. Dep't Intake Questionnaire [Ex. T].)

Pursuant to Prison policies in place at the time, an inmate who meets certain criteria may be recommended by the officer performing the classification interview for placement in protective custody. Protective custody status may also be requested by the inmate or his attorney, the police or the prosecutor, although such requests are reviewed by the Prison's Classification Committee. Alternatively, with the approval of a supervisor or Classification Committee member, an inmate may be placed on "house alone / block alone" ("HA/BA") status, in which the inmate is housed with the general population but without a cellmate. Another alternative, which can be elected by the correctional officers on a given shift at their discretion, is that an inmate may be locked down in his cell in the general population, with or without a cellmate, for the duration of the shift. (Jacob Dep. [Ex. L] at 10-18; Guarini Dep. [Ex. O] at 47-52.) Based on the amount of bail set for Eichelman and the fact that there was no room in the administrative segregation unit, Sgt. Terlikowsky assigned him to the "3-2" pod, which is a general population area of the Prison designated for maximum security inmates. Sgt. Terlikowsky was not aware that, on the previous shift, Sgt. Ennis had directed that Eichelman be held in a cell by himself. (Terlikowsky Dep. [Ex. J] at 27-28, 33-34.)

Before Eichelman arrived on the pod, news of the Taco Bell shooting had spread throughout the pod's inmate population through media coverage and rumors that a close relative of the victim was housed on the 3-2 pod. The identity of the shooter, however, was not known to them. (*E.g.*, Mackey Dep. [Ex. G] at 20; Strama Dep. [Ex. N] at 13-14, 31-32; Colon Dep. [Ex. U] at 101; Dixon Dep. [Ex. V] at 18.) Either just prior to or in conjunction with Plaintiff's arrival on the pod,

4

however, C.O. King, who was the officer in charge of the pod at the time, announced to the inmates in a loud voice that the man who shot the child at the Taco Bell was coming onto their pod. (Ramsey Dep. [Ex. F] at 13-15, 40-43; Mackey Dep. [Ex. G] at 11-12; Strama Dep. [Ex. N] at 12-13; Cotton Dep. [Ex. Y] at 70, 72.) C.O. King also went around the pod showing the inmates that morning's newspaper article regarding the shooting and the arrest of the suspect in the case. (Cotton Dep. [Ex. Y] at 70-71.) Some inmates banged on their cell doors and yelled that they were going to "f--- up" the person. (Ramsey Dep. [Ex. F] at 15; Cotton Dep. [Ex. Y] at 73.) Another officer commented to the effect that the shooter would get what he deserved. (Cotton Dep. [Ex. Y] at 71.)

C.O. King escorted Eichelman to a cell on the bottom tier of the 3-2 pod, in the corner farthest from the correctional officer's desk. A large pillar partially obstructed the limited view into the cell. (Ramsey Dep. [Ex. F] at 14.) When C.O. King walked around the pod later that evening and an inmate asked if Eichelman was the one who shot the Hispanic baby, C.O. King pulled on his shirt and commented that he did not want to lose his job but answered in the affirmative. (Mackey Dep. [Ex. G] at 11.) By Sunday morning, June 5, 2005, threats against Eichelman — who was recognized as the guy who shot the Hispanic child — continued. (Cotton Dep. [Ex. Y] at 75-77.)

At the afternoon shift change meeting held on Sunday, June 5, C.O. King advised his colleagues that Eichelman had been identified in the news media as the shooting suspect and that "they should pay very close attention to him." (King Dep. [Ex. M] at 31.) The fact that inmates "knew what Eichelman was being charged with" and that they had made threats against Eichelman was also discussed. (Walton Dep. [Ex. X] at 23.) Sgt. Terlikowsky instructed C.O. Walton, who was the officer assigned to the 3-2 pod for the next shift, to place Eichelman in "lock down" status for that 4:00 p.m. to 12:00 a.m. shift, meaning that Eichelman remained locked in his cell at all times

5

that other inmates were permitted out of their cells.  (Walton Dep. [Ex. X] at 14.  *See also* Unusual

Activity Report of Scott Kearse, dated June 13, 2005 [Ex. W] (reporting that C.O. Kearse was told

that  Eichelman was placed on lockdown status by supervisor of previous shift "because of his

charge").)  C.O. Walton asked Sgt. Terlikowsky at the shift change meeting whether Eichelman

should be placed on HA/BA status.  He was told, however, to mind his own business and do his job,

as there was not a potential risk.  (Walton Dep. [Ex. X] at 15.)  C.O. Walton's supervisor also told

him not to put any information in the "Pass On" book to the next shift about the earlier threats

against Eichelman, as they had not occurred on that shift's watch and no one during that shift had

approached Eichelman's cell.  (Walton Dep. [Ex. X] at 17.)  During that shift, officers did not

observe any taunting of Plaintiff or become aware of any new threats.  (Walton Dep. [Ex. X] at 16-

18.)

  C.O. Torres worked the 8:00 a.m. to 4:00 p.m. shift on the 3-2 pod on Monday, June 6, 2005.

He was advised by the correctional officer he was relieving that a guy who shot a two-year-old was

on the pod and that, while he heard some rumors that inmates were making threats, nothing had

happened.  He was not advised that Eichelman had been on lockdown status earlier.  (Torres Dep.

[Ex. I] at 19-20.)  During his shift, C.O. Torres recruited and incited various Hispanic inmates on

the pod to assault Eichelman.  He asked one inmate, Carlos Colon, and other inmates, in Spanish,

whether they were "going to let him" — meaning Eichelman — "get away with that, what he did to

the little Spanish kid."  He also told the inmates that if they wanted to "assault him or do anything"

to let him know.  Inmate Colon heard C.O. Torres pose a similar question to a Hispanic inmate in

the next cell, Jose Mendez, who replied that he was "down with it."  (Colon Dep. [Ex. U] at 17-20,

61-63, 104.)

6

At the same time, C.O. Torres prepared an "Unusual Activity Report" ("UA") stating that Inmate Mendez had stated that he was going to assault Eichelman because he "was the one who shot the 2 year old boy." (Unusual Activity Report of Luis Torres dated June 6, 2005 [Ex. Z].)  At the beginning of his lunch break, at approximately 10:00 a.m., C.O. Torres took his UA report to the office of his supervisor, Lt. Billy.  At the time, Lt. Billy was meeting with four other Prison officials about another matter.  C.O. Torres placed the UA report face down on Lt. Billy's desk, did not say anything to anyone about it, and took his lunch ticket and left the office.  (Torres Dep. [Ex. I] at 23-24; Billy Dep. [Ex. BB] at 18-20.)  Around 10:45 a.m., Lt. Billy had an opportunity to review the UA report.  He gave it to Sgt. Wolfe and asked him to "handle it," as Lt. Billy was being called away to take care of another matter elsewhere in the prison.  Sgt. Wolfe agreed to handle it right after finishing with the matter about which the group was meeting in the supervisors' office.  Neither Lt. Billy nor Sgt. Wolfe, however, called down to the 3-2 pod to inquire about the situation or to confirm their expectation that C.O. Torres would have locked Eichelman down.  (Billy Dep. [Ex. BB] at 20-21; Wolfe Dep. [Ex. CC] at 13-18; Billy Memo for Record dated June 8, 2005 [Ex. DD]; Wolfe Memo for Record dated June 8, 2005 [Ex. EE].)

C.O. Torres returned to the pod from his lunch break around 10:30 a.m.  He tried unsuccessfully to reach his supervisors by phone regarding his UA report.  Just after 11:00 a.m., he had the control center open the doors of all of the bottom tier of the pod to allow those inmates out for lunch.  (Torres Dep. [Ex. I] at 24-27.)  Around this time, at least two Hispanic inmates — Inmate Mendez and another inmate known as "Major," who had previously made threats directly to Eichelman — rushed into Eichelman's cell.  "Major" punched Eichelman, causing him to fall to the floor.  The inmates then punched and kicked Eichelman repeatedly.  Other inmates watched from

just outside the cell.  Eichelman screamed for help and then came rushing out of the cell with a towel

held up to his bleeding face.  (Eichelman Dep. [Ex. C] at 166-72; Torres Dep. [Ex. I] at 27-28;

Cotton Dep. [Ex. Y] at 83-84.)  C.O. Torres had been standing at the far end of the pod during the

incident and was approximately 12-15 feet away when he first heard Plaintiff cry out in pain.  He

yelled in Spanish to the inmates in the cell "stop!" or "get out!"  (Torres Dep. [Ex. I] at 36; Cotton

Dep. [Ex. Y] at 83-86.)

After the pod was secured, Eichelman was taken to the medical department, where he was

examined and treated.  At Lt. Billy's direction, he was taken back to the same cell but was housed

by himself and was placed on HA/BA status, which meant that his cell door was unlocked only when

all other inmates were locked in their cells.  (Eichelman Dep. [Ex. C] at 172-75, 182; Wolfe Dep.

[Ex. CC] at 21.)  When passing by his cell, inmates would bang on his cell door, yell "baby shooter"

or "baby killer" and threaten to kill or sexually assault him.  (Eichelman Dep. [Ex. C] at 174, 176;

Cotton Dep. [Ex. Y] at 97-99.)  Two days later, he was moved to a protective custody section of the

prison.  The following day, he was released.  (Eichelman Dep. [Ex. C] at 182-83, 195-96.)  He was

subsequently hospitalized for the injuries he sustained in the June 6th assault in his cell.

## III.    PROCEDURAL HISTORY

On February 6, 2006, Eichelman filed this action seeking compensatory damages, punitive

damages, and attorney's fees and costs.  All counts were brought pursuant to 42 U.S.C. § 1983 but

against various groupings of defendants and under various theories of § 1983 liability.  Count I is

brought under a failure to protect theory and remains against Correctional Officers King and Torres.

(Compl. at 14-15; Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 33.)  Count II of the

complaint was premised on a bystander liability theory.  After initial briefing, Plaintiff elected to

pursue the claim against C.O. Torres only, but then agreed to withdraw the claim in its entirety. (Compl. at 15-16; Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 23; Ltr. from T. Himebaugh, Esq. dated Aug. 16, 2007.)  Count III is premised on a conspiracy theory and remained against Correctional Officers King and Torres, as well as Warden Guarini.  (Compl. at 16-17.) Count IV is premised on a "policy, custom, pattern and practice" theory and remains against the County and Warden Guarini.  (Compl. at 18-20.)  A fifth count was premised on a deliberate indifference to serious medical needs and was brought against Dr. Doe (again, *not* a Doe defendant in the usual sense) and Nurse Stef Doe, both of whom have been dismissed.  (Compl. at 20.)  All of the individuals named in the suit were sued in their individual and official capacities.  (Compl. at 3-6.)

The various defendants filed their answers to the complaint and the parties proceeded with discovery.  The County Defendants and C.O. Torres now seek summary judgment as to all claims against them.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  *Id.*

## V.      DISCUSSION

### A.      Section 1983, Qualified Immunity

Section 1983 imposes civil liability upon any person who, under color of state law, deprives someone of the rights, privileges, or immunities secured by the federal Constitution or the laws of the United States. *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). This Court's initial inquiry as to each count of the complaint, therefore, is whether Plaintiff has "alleged the deprivation of a right that either federal law or the Constitution protects." *Gruenke*, 224 F.3d at 298. *See also Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979)). A violation of state law does not, in itself, give rise to a § 1983 claim. *See, e.g., Robison v. Via*, 821 F.2d 913, 922 (2d Cir. 1987) (violation of state law neither gives plaintiff a Section 1983 claim nor deprives defendants of the defense of qualified immunity); *see also Davis v. Scherer*, 468 U.S. 183, 197 & n.11 (1984) (an official does not lose qualified immunity if her conduct violated clearly established state law where the conduct did not violate clearly established federally protected rights).

A municipality cannot be held liable for the allegedly unconstitutional actions of its employees on a theory of *respondeat superior*. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978). Rather, a plaintiff must demonstrate that he suffered constitutional injuries that were caused by either a policy or custom of the municipality. *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).

Individual municipal officials named in a § 1983 action in their individual or personal capacities enjoy qualified immunity from liability under § 1983 so long as "their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997). The Supreme Court has cautioned that the inquiry as to whether a right was "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 914, 201 (2001). As the Court explained:

> "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [*Anderson v. Creighton*,] 483 U.S. [635,] at 640 [(1987)]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

*Id.*

Before proceeding to discuss each of the four counts of the complaint that are the subject of the pending motions for summary judgment, we note that Plaintiff alleged in his complaint as to several of these counts that the defendants' actions violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution, Article I §§ 8 and 9 of the Constitution of the Commonwealth of Pennsylvania, and "the laws of the United States and the Commonwealth of Pennsylvania." (*See* Compl. ¶¶ 68 (Count I), 74 (Count II), 80 (Count III), 85 (Count IV).) In their motion, the Lancaster County Defendants challenged the apparent contention that state law or the state constitution could provide a basis for § 1983 relief. (*See* Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 13.) Plaintiff's opposition brief focuses on the conduct that he contends violated his Fourteenth Amendment liberty interest. (*See* Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 16.) As the Lancaster County Defendants observe, Plaintiff's opposition appears to

demonstrate that he has abandoned claims premised on the state constitution or the Eighth Amendment.  (*See* Lanc. Cty. Defs.' Reply at 13.)

We agree that any violation by Defendants of the Pennsylvania Constitution would not, in and of itself, support any of Plaintiff's claims under § 1983.[4]  We also agree that relief would not be available under an Eighth Amendment theory of liability, as the Eighth Amendment concerns the treatment of persons already adjudicated guilty of a crime — which was not the case with Eichelman. *See Bell v. Wolfish*, 441 U.S. 520, 535-37 & n.16 (1979).  Therefore, our analysis will consider whether questions of material fact preclude summary judgment on Plaintiff's various theories of liability for a violation of his Fourteenth Amendment right not to be deprived of a liberty interest without due process of law.  *See id.* at 536 n.16 ("Where the State seeks to impose punishment without [a formal adjudication of guilt in accordance with due process of law], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.").  Conditions that amount to "punishment" of the detainee would violate the Due Process Clause.  *Id.* at 535-37.

**B.      Count I: Failure to Protect**

In Count I, Plaintiff asserts that various Correctional Officers "deliberately, recklessly and maliciously failed to take reasonable measures to ensure Plaintiff's safety from attack by other inmates and instead acted in such a manner as to encourage, facilitate and incite inmates to assault other inmates such as the Plaintiff."  (Compl. ¶ 65.)  He contends that the conditions of his

---

[4] To the extent a plaintiff might seek to recover damages directly for a violation of the Pennsylvania Constitution apart from 42 U.S.C. § 1983, we observe that "[t]he courts in this Circuit that have considered whether there is a private cause of action for damages under the Pennsylvania Constitution have concluded that no such right exists."  *Morales v. Taveras*, Civ. A. No. 05-4032, 2007 WL 172392, *17 (E.D. Pa. Jan. 18, 2007) (surveying cases).

incarceration posed a substantial risk of harm to him of which the Defendant Correctional Officers were aware but to which they were deliberately indifferent.  (Compl. ¶ 66.)[5]

In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court explained that "the core of the concept" of due process is "protection against arbitrary action" but that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Lewis*, 523 U.S. at 845, 846.  In a substantive due process challenge, therefore, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Id.* at 847 n.8.  The "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case."  *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999).  As the Third Circuit has explained:

> Where a defendant is confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim.  Where a defendant has the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience. Where a defendant has to act with some urgency, but does not have to make split-second decisions — such as when a social worker attempts to remove a child from the parents' custody — the defendant's actions must reach a level of gross negligence or arbitrariness that indeed shocks the conscience.

---

[5] We note that the Lancaster County Defendants' motion, while citing parenthetically to the *Lewis* case, characterized this claim as based on the Fourteenth Amendment's Equal Protection Clause.  (*See* Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 14-15.)  We see nothing in the complaint to suggest that Plaintiff's claim was premised on an equal protection argument, and Plaintiff's opposition to the summary judgment motion makes clear that "Plaintiff is not, as the Defendants assert, arguing an equal protection claim."  (*See* Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 16 n.4.)

*Kaucher v. County of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006) (quoting *Estate of Smith v. Marasco*, 430 F.3d 140, 153 (3d Cir. 2005) and *Miller*, 174 F.3d at 375-76) (internal citations and quotations omitted).

With respect to alleged constitutional violations occurring in the prison context, as another court in this district has noted, pretrial detainees asserting a constitutional violation based on conditions of their confinement must prove that prison officials acted with deliberate indifference; a lack of due care by an official that results in unintended injury is not actionable under the Due Process Clause. *See Lassiter v. Buskirk*, Civ. A. No. 03-5511, 2006 WL 1737170 (E.D. Pa. June 22, 2006) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993), and *Davidson v. Cannon*, 474 U.S. 344, 347 (1986)).  Where the injury experienced by a detainee is at the hands of another prisoner, § 1983 liability may be imposed on prison officials "if there was intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard on the part of prison officials." *Davidson v. O'Lone*, 752 F.2d 817, 828 (3d Cir. 1984).  Courts have found liability on behalf of prison officials in appropriate circumstances. *See, e.g., Wade v. Haynes*, 663 F.2d 778 (8th Cir. 1981) (prisoner small in stature and previously designated as susceptible to physical abuse nonetheless placed in cell with two inmates, one of whom was known to have fought in prison and was recommended for separation from general population; verdict for plaintiff following assault upheld due to evidence officer acted recklessly and with callous indifference to plaintiff's safety).

We proceed to analyze the record as to each of the remaining moving defendants.

### 1.    C.O. King

As part of their argument in their brief that the various individual Lancaster County Defendants are entitled to summary judgment on the grounds of qualified immunity, Defendants

14

acknowledge that Plaintiff alleges that it was C.O. King who informed inmates of the charges against Plaintiff.  Defendants contend, however, that because Plaintiff himself told his cellmate what charges were pending against him, "[t]he actions of the plaintiff himself, as well as the independent source for the information regarding [the] charges" — the newspaper — "establish that Officer King is not the source of the plaintiff's injuries."  (Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 28.)  They argue that this claim cannot proceed against C.O. King as a matter of law because Plaintiff has failed to establish any damages as a result of conduct by this officer.

In response, Plaintiff points to contrary record evidence that, prior to Plaintiff's arrival, the inmates on that particular pod knew only generally that a man had shot a two-year-old Hispanic boy at Taco Bell but did not know who that person was.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 20-21 (citing Colon Dep. [Ex. U] at 101-02 and Strama Dep. [Ex. N] at 31-32).)  C.O. King bridged that gap for them by, according to one version of events, announcing that the shooter in that incident was being brought up to the pod, waiving in front of the inmates the newspaper article identifying Eichelman as the suspect in that shooting, and responding in the affirmative when, after Eichelman was brought to his cell, an inmate asked if Eichelman was "the guy."  (Ex. G [Mackey Dep.] at 11.)  Plaintiff also points to the absence of any evidence that the one person with whom he had any discussion about the charges against him — his cellmate — assaulted Plaintiff or provided this information to anyone who assaulted Plaintiff.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 21.)  (*See also id.* at 7 (and authorities cited therein).)

Given the posture of the case, we must accept as true the facts most favorable to Plaintiff that are supported by the record.  On this record, there is sufficient evidence from which a reasonable jury could conclude that C.O. King was responsible, through his deliberate actions, for various inmates

15

on the pod learning of the particular crime with which Eichelman was charged and, through his announcements to this effect, suggesting that this information would be useful to the other inmates. The next question, however, is the extent to which this knowledge by the inmates gave rise to a risk of serious harm to which C.O. King was deliberately, recklessly or callously indifferent when he provided the inmates this information.

The extent to which someone believed to have shot a young child is at greater risk of an inmate assault is another factual issue on which the parties disagree.  For purposes of this claim, the significant fact is C.O. King's testimony that he believed that an inmate charged with "crimes against children" was more likely to be "harassed" by other inmates.  (King Dep. [Ex. M] at 18.)  He himself did not discount the real possibility of such violence, as he identified at the shift change meeting on Sunday, June 5 that inmates were threatening to assault Eichelman.  Moreover, there is no evidence that Eichelman was at risk of an inmate assault for any other reason other than based on the charges on which he was being detained.

Applying the standards set forth for claims of failure to protect, we conclude that C.O. King may be liable to Plaintiff for actions taken with deliberate or reckless indifference to the risk of an inmate assault on Eichelman.  Furthermore, we conclude that the record before us provides sufficient evidence from which a reasonable jury could find that C.O. King acted with deliberate indifference to Plaintiff's safety when, knowing that Eichelman was not in protective custody but rather was in the general population among violent offenders with whom he would have contact (i.e., at meal times) and was housed in a cell furthest from the guard post, he informed inmates of the arrival of the Taco Bell shooter, provided inmates the newspaper article that identified Eichelman as the

16

suspect, and confirmed for an inquiring inmate that Eichelman was "the guy" involved in the shooting.

We note that the individual Lancaster County Defendants have invoked the doctrine of qualified immunity as a shield to all of the counts brought against them in their individual capacities. They correctly note that if the Court finds that there has been a constitutional infraction, it must then inquire as to whether the right violated by the defendant was clearly established at the time of the infraction such that it would have been clear to a reasonable official in the situation confronting him that his conduct would be unlawful. (*See* Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 26-27.)  With respect to C.O. King in particular, defendants do not point to any mistaken but reasonable belief by C.O. King that his actions were constitutionally permissible.  Rather, they merely repeat their factual argument — which is misplaced at this summary judgment stage given contrary evidence in the record — that Eichelman's alleged role in the Taco Bell shooting was publicized by Eichelman himself and by the local newspaper. (*See id.* at 27-28.)  Defendants do not direct us to any authority for the proposition that a reasonable official might have mistakenly believed that informing violent inmates of the fact and nature of the charges against Eichelman in this situation would not violate Eichelman's due process rights.  Therefore, we find that C.O. King has not met his burden, at this stage of the litigation, to show that he is entitled to qualified immunity as to the failure to protect claim asserted against him in his individual capacity in Count I. Accordingly, we will not grant C.O. King's request for summary judgment as to this count.

### 2.    C.O. Torres

In his motion for summary judgment, C.O. Torres seeks to distance himself from the earlier assault on Eichelman in the holding cell, the decision to house Eichelman in the 3-2 pod, and the

events through which the inmates learned of the particular charges against Eichelman. (Br. in Supp. of Torres Mot. for Summ. Jmt. at 3-4, 9-10.) As Plaintiff's response did not attempt to relate the events of June 4 and June 5 to any actions by C.O. Torres, we agree with Torres that those allegations do not support a failure to protect claim against him. (*See also* Reply Br. in Supp. of Torres Mot. for Summ. Jmt. at 3-5.) That conclusion does not, however, resolve all of the issues as to C.O. Torres.

With respect to the events that did occur during his shift on June 6, 2005, C.O. Torres attempts to paint himself as a proactive, responsible official who acted in the interest of Eichelman's safety to the extent to which he believed he had authority to take various measures. (Br. in Supp. of Torres Mot. for Summ. Jmt. at 10-11.) He argues that he was under a duty only to take reasonable measures to ensure Eichelman's safety and that any failure to have done so can be characterized only as "mere negligence and/or carelessness" — which does not amount to a constitutional violation. (*Id.* at 11; Torres Reply at 6.)

In response, Plaintiff points to the evidence of record of C.O. Torres's personal involvement in the attack that occurred on June 6. According to one inmate, C.O. Torres was "recruiting various prisoners or inciting various Spanish prisoners to assault Mr. Eichelman because of the kid he had shot." (Colon Dep. [Ex. U] at 17.) Among the prisoners that C.O. Torres approached — asking if he was going to let "him" (Eichelman) get away with what he did — was Inmate Mendez, who ultimately proved to be one of the two assailants in the attack of Eichelman in his cell. (*Id.* at 20.) C.O. Torres also allegedly offered to help to facilitate an inmate assault on Eichelman. (*Id.* at 17-18.) Plaintiff asserts that a reasonable jury could conclude from this evidence alone that C.O. Torres played a role in instigating the assault on Eichelman.

18

Plaintiff also points to C.O. Torres's decision — shortly after writing up a "UA" report for supervisors informing them of what he believed was a credible threat of harm towards Plaintiff by Inmate Mendez — to include Plaintiff's cell door in the general cell door opening for the lunch hour. Plaintiff characterizes this action as deliberate, reckless, and callous.  (Pl.'s Br. in Opp. to Torres Mot. for Summ. Jmt. at 18.)  C.O. Torres attributes this action to the lack of any instructions to the contrary from his supervisors, with whom he had not spoken personally about Eichelman's situation. (Br. in Supp. of Torres Mot. for Summ. Jmt. at 10-11.)  He testified that he did not believe that he had the authority to order an inmate to be locked down in his cell.  (*Id.* at 10 (citing Torres Dep. [Ex. I] at 24).)

Regardless of whether or not the failure to have excluded Plaintiff's cell door from the general opening of the doors on the pod for lunch or for any other purpose[6] qualifies as an act of deliberate indifference, we agree that a reasonable jury could find that C.O. Torres acted recklessly and callously by intentionally inciting animosity in the inmates towards Eichelman and that he acted with an awareness of the risk that his actions would result in serious harm to Plaintiff at the point in time in which other inmates inevitably would have access to him.  In fact, it appears that this may have been his objective.  On this record, there is sufficient evidence from which a jury could find that C.O. Torres acted with deliberate indifference to the risk of harm to Eichelman and that his actions satisfied the Fourteenth Amendment "shocks the conscience" standard.

As did the other defendants, C.O. Torres also invokes the doctrine of qualified immunity as a defense to the aspect of this claim that is brought against him in his individual capacity.  (*See* Br.

_____

[6] We note that there is also evidence in the record suggesting that the attack occurred just before the general opening of the doors for lunch.

in Supp. of Torres Mot. for Summ. Jmt. at 15-16.)  The only basis for his assertion of qualified immunity is his contention that "the facts of record do not establish any cognizable § 1983 claims against Defendant Torres."  (*Id.* at 16.)  For the same reasons that we declined to extend qualified immunity to C.O. King, we find that C.O. Torres has not met his burden, at this stage of the litigation, to show that he is entitled to qualified immunity as to the failure to protect claim asserted against him in his individual capacity in Count I.  Accordingly, we will not grant C.O. Torres's request for summary judgment as to this count.

### C.      Count III: Conspiracy

In Count III, which invokes § 1983 and which Plaintiff captions "conspiracy," Plaintiff asserts that the defendants "entered into an agreement and/or reached a meeting of their minds to violate Plaintiff's Constitutional Rights by permitting, encouraging, facilitating and inciting other inmates to cause physical harm to the Plaintiff" and that the defendants "performed overt acts in furtherance of the conspiracy."  (Compl. ¶¶ 77-78.)  In his response to the Lancaster County Defendants' motion for summary judgment and at the final pre-trial conference, however, Plaintiff withdrew this claim as to certain defendants.  (*E.g.,* Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 33.)  As a result, the named defendants remaining in this count are C.O. King, C.O. Torres, and Warden Guarini.[7]

Municipal officials may be liable under § 1983 for a conspiracy to deprive an individual of a right protected under the Constitution or federal law.  In order to state a claim for conspiracy under § 1983, the plaintiff must demonstrate (1) the existence of a conspiracy involving state action; and

---

[7] During the oral argument held at the final pre-trial conference, the parties did not focus on this aspect of the claim as against Warden Guarini.  However, as Plaintiff did not affirmatively withdraw his claim as to Warden Guarini under Count III, we discuss it here.

(2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.  *See Marchese v. Umstead*, 110 F. Supp.2d 361, 371 (E.D. Pa. 2000).  A conspiracy has been defined in other contexts as "a combination between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, or to accomplish an unlawful purpose."  *Franklin Music Co. v. American Broadcasting Cos., Inc.*, 616 F.2d 528, 534 (3d Cir. 1979).  *See also id.* at 547.  To prevail on a conspiracy claim, the plaintiff must present evidence of an agreement — "the *sine qua non* of a conspiracy," *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997) — as it is "not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism."  *Spencer*, 968 F. Supp. at 1020.

Defendants contend that Plaintiff has failed to meet his burden at this stage of the litigation to support his conspiracy claim, pointing to a lack of evidence in the record that any of the defendants spoke to each other about Eichelman or were involved in any common plot or plan to deprive him of his constitutional rights.  (*See* Torres Reply at 10; Lanc. Cty. Defs.' Reply at 27.)  Plaintiff's opposition to the summary judgment motions recites what he believes is evidence of a practice at the Prison of "intentionally 'looking the other way' when it comes to protecting inmates charged with heinous crimes against children from violence at the hands of other inmates."  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 24; Pl.'s Opp. to Torres Mot. for Summ. Jmt. at 20.)  He contends that "[t]he conspiracy to facilitate an assault on the Plaintiff largely involved Defendants King and Torres."  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 25; Pl.'s Opp. to Torres Mot. for Summ. Jmt. at 20.)  He proceeds to describe the fact that C.O. King and C.O. Torres incited inmates to assault Plaintiff and that they both failed to ensure that Plaintiff would be protected from other inmates.  (*Id.*)  He contends that the conspiracy "further included" two

supervisors who were aware of C.O. Torres's unusual incident report and who failed to act to ensure Plaintiff's safety.  (*Id.*)  Plaintiff asserts that he "has alleged facts that establish an understanding among correctional and supervisory staff to intentionally and deliberately disregard clear warnings that Plaintiff was in serious and imminent danger of being assaulted by other inmates" and facilitated the assault by putting him in the general populations rather than in a more secure setting.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 25-26; Pl.'s Opp. to Torres Mot. for Summ. Jmt. at 21.)

### 1.    C.O. King

As discussed above, the record as to C.O. King's involvement in this matter pertains to his unsolicited announcements to inmates on June 4 that Eichelman was the suspect in the Taco Bell shooting and his affirmative response to questions from inmates about whether Eichelman was the one who shot the Hispanic baby.  The inmates' response, in turn, was to bang on their cell doors and yell that they were going to "f--- up" Eichelman.  The record does not indicate that King tried to dissuade them in any way.  Rather, it appears that C.O. King's conduct was designed to facilitate this reaction and to demonstrate his support for the inmates' stated intention of assaulting Eichelman.

The record supports a reasonable inference that there was an agreement between C.O. King and the inmates on the pod that Eichelman should be assaulted due to the nature of the crime with which he was charged.  This would constitute a conspiracy involving state action and, given the assault sustained by Plaintiff by inmates on the pod, a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.  *See Marchese*, 110 F. Supp.2d at 371.  We find that this is sufficient evidence to permit Plaintiff's conspiracy claim as to C.O. King to proceed to the jury.

### 2.    C.O. Torres

As with C.O. King, the record supports that C.O. Torres communicated to inmates that Eichelman was the shooter of the young Hispanic child.  It further supports that he did more: he advised Inmate Mendez that "if you want to do anything about it," to "let him know."  Inmate Mendez responded that he was "down with it" — to count him in.  (Colon Dep. [Ex. U] at 18, 104.) This response suggests that Mendez understood C.O. Torres's suggestion as an offer to facilitate an assault on Eichelman — something which other inmates testified was possible with the assistance of correctional officers.  (*See* Colon Dep. [Ex. U] at 18 ("We all knew that if a person or if I put myself in that place, if I wanted to assault him, we knew that somehow Mr. Torres would open our door or had given us access to his cell at one time or another to go into his cell and assault him.").) We find that this is more than sufficient evidence to permit Plaintiff's conspiracy claim as to C.O. Torres to proceed.

### 3.    Warden Guarini

There is no evidence in the record that Warden Guarini entered into any agreement with any Prison personnel or inmates to violate Eichelman's constitutional rights.  Plaintiff's papers describe no personal involvement the Warden had with any of incidents upon which this complaint is based. While Plaintiff suggests that there was an "understanding" among corrections officers and supervisory staff to ignore risks to particular inmates, this does not provide the agreement or overt act required to assign liability to Warden Guarini on a § 1983 conspiracy theory.  Therefore, Warden Gaurini is entitled to summary judgment on this count.

D.     **Count IV: *Monell* Claim**

In Count IV, which is brought against the County and Warden Guarini, Plaintiff asserts that "Defendants have adopted and maintained for many years recognized and accepted policies, customs, and practices within the prison . . . which knowingly place inmates such as the Plaintiff in dangerous positions and/or increase the risk of danger to inmates such as the Plaintiff."  (Compl. ¶ 84.) Plaintiff's complaint describes ten different policies, customs, or practices that demonstrate the defendants' deliberate indifference to individuals such as Eichelman:

A.     Having a custom, policy and practice of permitting correctional officers to discuss with other inmates the nature of the crimes that new inmates/pre-trial detainees are charged with, thereby encouraging, facilitating and inciting potential inmate on inmate assaults;

B.     Having a custom, policy and practice whereby correctional officers facilitate, encourage and incite inmate fights by taunting inmates and allowing inmates to taunt and threaten other inmates;

C.     Having a custom, policy and practice whereby correctional officers facilitate, encourage and incite inmate fights by opening otherwise locked cell doors, allowing violent inmates access to other inmates;

D.     Having a custom, policy and practice whereby correctional officers facilitate, encourage and incite inmate on inmate assaults by failing to properly and timely respond to them and break them up;

E.     Having a custom, policy and practice of ignoring and/or downplaying the seriousness of inmate on inmate violence, thereby acquiescing to an environment where inmate on inmate violence is accepted;

F.     Having a custom, policy and practice of failing to properly train, supervise, investigate and discipline correctional staff in order to prevent inmate on inmate assaults from occurring;

G.      Having a custom, policy and practice of improperly classifying and/or housing pre-trial detainees with violent convicted individuals;

H.      Having a custom, policy and practice of failing to appropriately identify inmates who should be placed in protective custody and/or failing to place those inmates in protective custody;

I.      Having a custom, policy and practice of failing to ensure that inmates (including but not limited to pre-trial detainees) are humanely treated at all times, including but not limited to being provided food and timely medical treatment; [and]

J.      Having a custom, policy and practice of failing to provide adequate, proper and timely medical care to individuals such as the Plaintiff who have been assaulted within the facility[.]

(Compl. ¶ 84.)

## 1.      The County

It is well-established that a municipal entity is not liable under § 1983 on a vicarious liability or respondeat superior theory. *Monell v. Department of Social Servs.*, 436 U.S. 658, 691-92 (1978). A local government unit can be found liable as a "person" within the meaning of § 1983, however, where a government body itself causes the constitutional violation at issue. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." *Id.* at 694. A course of conduct within the governmental unit can rise to the level of an actionable "custom" when, although not authorized by law, the conduct is so long-standing and well-settled that it can be said to virtually constitute law. *Id.* at 690-91; *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). "Proof of a single incident of unconstitutional activity is not sufficient

to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy" or unless the plaintiff separately proves that the policy was unconstitutional. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). "Custom may be established by proof of knowledge and acquiescence." *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 n.10 (1986)). The plaintiff must establish "scienter-like" evidence with respect to some policymaker in order for liability to attach to the government entity. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1062-63 (ed Cir. 1991). This evidence must point either to actual knowledge or to reckless indifference on the part of the policymaker. *Id.* at 1060-61 & n. 14. "[A]bsent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom, or a failure to train." *Id.* at 1063. Subjective knowledge on the part of the policy-making official "can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). *See also Farmer v. Brennan*, 511 U.S. 825, 844 (1994). In any case, the plaintiff must show a causal link between the execution of the government policy and the injuries suffered. *Berg v. County of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000). More specifically, the plaintiff must show that the defective policy or custom was the "moving force" behind the violation of the plaintiff's constitutional rights. *Monell*, 436 U.S. at 694. A plaintiff may do this by establishing that alternatives for preventing this type of harm were known and available to policymakers but that the policymakers either deliberately chose not to pursue them or acquiesced in a longstanding policy or custom of inaction in this regard. *Simmons*, 947 F.2d at 1064, 1074.

26

As demonstrated above, Plaintiff has identified ten alleged municipal customs, practices, or policies about which he argues there are sufficient facts to proceed to trial, several of which are interrelated.  It is not necessary for us to review the state of the record as to each alleged policy, as we conclude that there are sufficient issues for trial as to at least one of the policies.

For example, Plaintiff contends that correctional officers facilitated, encouraged and incited inmate assaults by taunting inmates and sharing with them the nature of the crimes of new inmates/pre-trial detainees.  Plaintiff also contends that the defendants generally have a custom, policy and practice of ignoring and/or downplaying the seriousness of inmate on inmate assaults, which has led to an environment in which such assaults are accepted.  Defendants point to the testimony of the officers that they did not engage in any improprieties, the lack of any formal policy permitting these activities, and the lack of evidence that the allegedly violent environment of which Plaintiff complained was something to which Defendants acquiesced.

In response, Plaintiff points to inmate testimony during discovery that guards routinely volunteered criminal charge information about an inmate to other inmates.  Plaintiff points to evidence that both C.O. King and C.O. Torres disclosed information about the charges against Eichelman to other inmates on the pod and that C.O. Riley informed two constables in the commitment area — who would presumably have no law enforcement need to know — of the charges against Eichelman. (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 27-28.) He also points to the fact that, prior to the assault on Plaintiff, another inmate had filed numerous grievances with Warden Guarini and the Deputy Warden about officers' disclosure of confidential inmate information and of violence between inmates on the pod.  The fact that the Warden allegedly stopped responding to the grievances suggests that he — the ultimate policymaker for the Prison — was

acquiescing in this conduct by his subordinates.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 29 (citing Cotton Dep. [Ex. Y] at 57-61).)  The fact that there was no investigation by the Prison of the earlier assault on Eichelman in the holding cell by Inmate Soto nor any discipline of Soto for that assault also could evidence a downplaying of the seriousness of inmate on inmate attacks.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 31.)  In a similar vein, Plaintiff contends that "neither of the inmates who assaulted Plaintiff on the pod were given misconducts or otherwise disciplined by the prison staff." (*Id.* at 30.)  He complains that the failure to convey in the "Pass On" book to the next shift information about prior threats to Plaintiff which resulted in a one-shift lock-down also demonstrated a downplaying of the risk of harm.  (*Id.* at 31.)  Finally, he argues that the failure of the Prison to seek to identify and correct errors made by correctional and supervisory staff relating to the attack in the pod demonstrates that "[a]dministrators and policymakers within [the Prison] deliberately ignored the real problem, thereby establishing their acquiescence to a pattern, policy and custom of continued inmate on inmate violence at [the Prison]." (*Id.*)

We conclude at this stage that Plaintiff has presented sufficient evidence from which a jury could reasonably conclude that, notwithstanding any formal policy prohibiting correctional officers from discussing with inmates (and others who have no need to know of the information) the nature of the charges pending against a pre-trial detainee or convicted criminal, there was such a well-settled practice among at least some corrections officers as to constitute a custom and, moreover, that there is sufficient evidence upon which a reasonable jury could conclude that Warden Guarini must have known of the risk.  As these customs and policies bear a sufficient causal connection to the

assault that Plaintiff experienced on June 6, 2005, we conclude that Plaintiff may proceed to trial on this theory of *Monell* liability against the County.

### 2.    Warden Guarini

Plaintiff also identifies Warden Guarini as a defendant in the count captioned as the "policy, custom, pattern and practice" claim.   While claims relating to policies, customs, and practices ordinarily pertain to the liability that may be attributed to a local governmental unit as opposed to an official under the *Monell* case, we see no reason that Plaintiff cannot proceed with this § 1983 claim against Warden Guarini individually, particularly in light of the fact that Defendants' papers do not provide any reason he should be dismissed from this action apart from Plaintiff's alleged failure to identify a custom, practice, or policy that cause his harm.   (*See* Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 19-27; Lanc. Cty. Reply Br. at 33-34.)

"[D]eliberate indifference claims implicating supervisors for their deficient policies are more complicated than the other, more direct deliberate indifference claims, because the former add another level to the analysis."  *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001).   A plaintiff can hold a supervisor liable for his deficient policies if he can identify a specific policy or practice that the supervisor failed to employ and demonstrate that: (1) the existing policy or practice created an unreasonable risk of the constitutional injury he sustained; (2) the supervisor was aware of the unreasonable risk that was created (or that it was so great and so obvious); (3) he was indifferent to that risk; and (4) the injury resulted from the policy or practice.  *Id.* at 134-35.

Although the parties' briefing as to this count of the complaint does not separately address the propriety of this claim as to Warden Guarini, Plaintiff's opposition to the Lancaster County Defendants' motion for summary judgment points to evidence in the record that, prior to the assault

on Plaintiff, another inmate had filed numerous grievances with Warden Guarini and the Deputy Warden about officers' disclosure of confidential inmate information and of violence between inmates on the pod.  The fact that the Warden allegedly stopped responding to the grievances arguably suggests that he was ratifying the conduct of his subordinates, which contributed to the creation of an environment in which the assault on Plaintiff was bound to occur.  (Pl.'s Opp. to Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 29.)

We conclude that, at this stage, Plaintiff has presented sufficient evidence from which a jury could reasonably conclude that, notwithstanding any formal policy prohibiting correctional officers from discussing with inmates (and others who have no need to know of the information) the nature of the charges pending against a pre-trial detainee or convicted criminal, there was such a practice among at least some corrections officers and that these actions were effectively ratified by Warden Guarini through his failure to respond when the situation was brought to his attention via inmate grievances.  Therefore, Plaintiff may proceed to trial on this theory of liability against Warden Guarini.

Again, we recognize that the individual Lancaster County Defendants have invoked the doctrine of qualified immunity as a shield to all of the counts brought against them in their individual capacities, noting that if the Court finds that there has been a constitutional infraction, it must then inquire as to whether the right violated by the defendant was clearly established at the time of the infraction such that it would have been clear to a reasonable official in the situation confronting him that his conduct would be unlawful.  (*See* Br. in Supp. of Lanc. Cty. Defs.' Mot. for Summ. Jmt. at 26-27.)  Defendants do not, however, point to any mistaken but reasonable belief by Warden Guarini that his actions were constitutionally permissible.  Defendants do not direct us to any authority for

the proposition that a reasonable official might have mistakenly believed that the broadcast by prison officials to violent inmates of the fact and nature of the charges against Eichelman in this situation would not violate Eichelman's due process rights.  Therefore, we find that Warden Guarini has not met his burden, at this stage of the litigation, to show that he is entitled to qualified immunity as to the claim asserted against him in his individual capacity in Count IV.  Accordingly, we will not grant Warden Guarini's request for summary judgment as to this count.

**VI.   CONCLUSION**

For the foregoing reasons, we find that Plaintiff has adduced sufficient evidence from which a reasonable jury could find in his favor with respect to Count I against C.O. King and C.O. Torres; Count III against C.O. King and C.O. Torres; and Count IV against the County and Warden Guarini. Summary judgment is appropriate, however, as to Warden Guarini on Count III.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN B. EICHELMAN, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LANCASTER COUNTY, et al., | : | |
| Defendants. | : | NO. 06-547 |

## ORDER

AND NOW, this    21st   day of August, 2007, upon consideration of the Motion for Summary Judgment filed by Defendants Lancaster County, Warden Vincent Guarini, Deputy Warden Doe, Corrections Officer King, Corrections Officer Volroth, Corrections Officer Lambert, Corrections Officer Neff, Corrections Officer Walton, and Corrections Officer Sultzbach (Doc. No. 31) and the Motion for Summary Judgment of Corrections Officer Luis Torres (Doc. No. 32), the memoranda of law filed in support thereof and in opposition thereto as well as defendants' replies, and for the reasons stated in the accompanying memorandum, IT IS HEREBY ORDERED that said motions are **GRANTED IN PART AND DENIED IN PART** as follows:

(1)     The Motion for Summary Judgment filed by Defendants Lancaster County, Warden Vincent Guarini, Deputy Warden Doe, Corrections Officer King, Corrections Officer Volroth, Corrections Officer Lambert, Corrections Officer Neff, Corrections Officer Walton, and Corrections Officer Sultzbach (Doc. No. 31) is **GRANTED** as to all claims brought under Count III (conspiracy) against Warden Guarini in his individual and official capacities.

(2) The Motion for Summary Judgment filed by Defendants Lancaster County, Warden Vincent Guarini, Deputy Warden Doe, Corrections Officer King, Corrections Officer Volroth, Corrections Officer Lambert, Corrections Officer Neff, Corrections Officer Walton, and Corrections Officer Sultzbach (Doc. No. 31) is **DENIED AS MOOT** as to Deputy Warden Doe, Corrections Officer Volroth, Corrections Officer Lambert, Corrections Officer Neff, Correction Officer Walton, and Corrections Officer Sultzbach, who already have been dismissed in this matter pursuant to the Court's Orders dated August 10 and August 15, 2007 (Doc. No. 66 & 76).

(3) The Motion for Summary Judgment filed by Defendants Lancaster County, Warden Vincent Guarini, Deputy Warden Doe, Corrections Officer King, Corrections Officer Volroth, Corrections Officer Lambert, Corrections Officer Neff, Corrections Officer Walter, and Corrections Officer Sultzbach (Doc. No. 31) is **DENIED** in all other respects.

(4) The Motion for Summary Judgment of Corrections Officer Luis Torres (Doc. No. 32) is **DENIED AS MOOT** as to all claims brought under Count II (bystander liability) against Corrections Officer Torres in his individual and official capacities, in light of Plaintiff's withdrawal of this claim in correspondence dated August 16, 2007.

(5)     The Motion for Summary Judgment of Corrections Officer Luis Torres (Doc. No. 32)

is **DENIED** in all other respects.[1]


BY THE COURT:


/s/ David R. Strawbridge

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE

---

[1] Accordingly, the claims proceeding to trial are as follows: Count I against C.O. King and C.O. Torres; Count III against C.O. King and C.O. Torres; and Count IV against the County and Warden Guarini.